## ROBINSON *et al. v.* TAYLOR.

*(Circuit Court, N. D. Mississippi, E. D.* June 18, 1890.)

1. RECEIVERS—APPOINTMENT.

On motion for the appointment of a receiver of the property of a decedent in possession of one claiming to be his son and heir, complainants alleged that they were the next of kin and collateral heirs of decedent, who died without lineal heirs, and that defendant was his illegitimate son. Defendant answered that he was decedent's legitimate son and heir, and there was evidence showing that decedent had lived for many years with defendant's mother, recognizing her as his wife, and defendant as his son. After living thus together, defendant's mother entered into illicit intercourse with another man, and was repudiated by decedent, and afterwards both he and the woman stated that they had never been married. Decedent deeded all his property to defendant, and the deeds were attacked by complainants as invalid. *Held* that, as defendant could suffer no great harm by holding that complainants had established a *prima facie* right to the estate, a receiver would be appointed until final hearing on the merits of the case.

2. SAME.

In such case, defendant, being shown to be competent to manage the estate, was appointed receiver on giving bond.

In Equity.

*Mr. Bristow* and *Inge & Birge*, for complainants.

*Bogle & Young* and *Jordan Boone*, for defendant.

HILL, J. The questions now for decision arise upon complainants' motion for the appointment of a receiver to take charge of, preserve, and manage the property and estate described in the bill. The allegations in the bill are that complainants are the only next of kin and heirs at law of Alonzo H. Taylor, who died intestate in Alcorn county in this state; that he died seised and possessed of the real and personal estate described in the bill, and that the defendant is unlawfully in possession of the same, and holding it adversely to the claims of complainants, and that defendant is insolvent; that the complainants' interests require the appointment of a receiver to take possession of, hold, and manage said estate during this litigation. The answer of the defendant denies that complainants are the next of kin and heirs at law of said decedent, A. H. Taylor, and entitled to the estate and property described in the bill, or that they have any title, claim to, or interest in the same. The answer further states that defendant is the legitimate son, and only next of kin and heir at law, of said A. H. Taylor, and as such is entitled to, and is the owner of, all the estate, real and personal, of which said decedent died seised and possessed, and admits that he died intestate. The answer further avers that the said A. H. Taylor, in his life-time, conveyed all of the real estate, personal property, choses in action, etc., described in the bill, by two deeds filed as exhibits to the answer, and asked to be made parts of it.

A very large number of affidavits and exhibits have been filed as testimony on both sides; and the questions have been argued at great length, and with great ability, by the distinguished counsel on both sides, as if the cause were on final hearing. The answer of the defendant throws the burden upon complainants to produce strong *prima facie* evidence that they have the title, legal or equitable, to the estate and property described in the bill; otherwise their motion must be denied. The affidavits show that complainants are the daughters of John C. Taylor, who was a brother of said A. H. Taylor, and who died before A. H. Taylor; that said A. H. Taylor left surviving him no father, mother, brother, or sister, or descendant of such, except complainants; and that, in the absence of a child, widow, or descendant of such, the complainants are the next of kin and heirs at law of said A. H. Taylor. The defendant, John W. Taylor, in his answer, avers that he is the lawful and legitimate son of decedent, and as such is entitled to the inheritance of all the estate, real and personal, of which he died seised and possessed. If this is established by the proofs, then complainants have no claim thereto. The burden of showing that defendant is such legitimate son, next of kin, and heir at law of the decedent, is upon defendant,—not in this proceeding to that degree of certainty that will be required upon final hearing, but so as to rebut the *prima facie* title of complainants; which brings us to consider the proof which has been presented on both

sides, mostly by *ex parte* affidavits, and which shows the following facts:

Some time about the year 1857 or 1858, decedent resided in the town of Houston, in this state, and was engaged as a broker or money lender. At the same time a young woman by the name of Jane Hoskins was engaged in teaching music in a female academy in the same town. The former was from the state of New York, and the latter from the state of Vermont. Both occupied respectable positions in society, and, as was natural, the parties became intimate as friends, if not as lovers. Some time after their acquaintance commenced, it was public talk that their intimacy had become unlawful, which resulted in her dismissal from her position as music teacher; and she thereupon left the town of Houston, and never afterwards returned to that place. The next information shown by the proof of her whereabouts was that, some time before the year 1861,—the precise time does not appear from the proof,—said A. H. Taylor and Jane, formerly Hoskins, were boarding together in the city of Yazoo, in this state, representing themselves as husband and and wife, and having a daughter, whom they called Lonnie, then some two years old, and whom they represented as their child. Decedent spent a portion of his time with his reputed wife and child, and a portion of his time attending to his business at that place, but saying nothing there about his connection with Jane, formerly Jane Hoskins. The proof shows him to have been very reticent in relation to his family and business relations. The proof further shows that when in Yazoo City the parties passed as husband and wife, without any suspicion that they were otherwise, and that they were so received and considered by the most respectable portion of that community; that some time during the year 1861, decedent, with his reputed wife and child, went to Jacksonville, in the state of Alabama, where they represented themselves as husband and wife, and their child Lonnie as their child, and where they were so received and treated by the respectable portion of the community, with no suspicions to the contrary; that during their stay in Jacksonville the defendant, John W. Taylor, was born, and was recognized by them as their child; that during this time the little girl Lonnie died. Decedent during all this time spent part of his time with his reputed wife and children, and part of his time in Houston, looking after his business at that place. The proof further shows, that some time during the year 1865, decedent went with his wife and defendant, then a small child, to the state of New York, and procured a residence for the time on Bond street, in the city of New York, where they resided a portion of the time, visiting and remaining for some time in the town of Carmel, his former home, and the home of his family, at that time occupied by his sister; that he represented Jane as his wife, and the defendant as his son, and that they were considered as such by his family and friends; that, in the fall of 1866, decedent sent Jane to Europe, to complete her musical education, and especially to train her voice,—her natural talent for vocal music being unusual, and highly appreciated by the decedent; that this was carrying out a purpose which he had expressed some time before that; that defendant was left with the sisters of A. H. Taylor, who

took great interest in him, and attended to all his wants; that these sisters—one of them being a widow without children, and the other a maiden lady—were very much devoted to him, and that they reared him, and attended to his education, until he was placed by his father in Carmel University, where he remained until he graduated; A. H. Taylor furnishing his said reputed wife with all the funds she needed until her return the last of 1871. A. H. Taylor, after 1866, returned to this state, and looked after his interest in Houston and the surrounding country, making his head-quarters in Houston, until 1869, when he removed to the city of Corinth, where he established the Tishomingo Savings Institution, of which he was the principal stockholder, president, and principal manager. He was at the same time the owner of numerous tracts of land in different counties in this state. About the last of the year 1871, Mrs. Taylor, as she was known, returned to the United States, and came to the city of Corinth, where A. H. Taylor then resided. He stated to a lady friend who had known him in Houston that his wife would soon return. When she came, she brought with her a boy whom she called her son, then some four or five years of age. She was received by A. H. Taylor, and treated as though she were his wife, until some time in the latter part of 1872, when an illicit intercourse was entered into between said Jane and one R. T. Dunn, which being made known to A. H. Taylor, he repudiated her; and from that time forward the relationship which had before that time existed between them ceased, and was never afterwards renewed. In fact, feelings of hostility between them continued; and there is testimony showing that each stated that they were not man and wife, and had not been married. But Jane claimed that decedent was under obligations to pay her money, or to support her; that a settlement and compromise was made between them, by which decedent gave her his obligation to pay her $250 quarterly during her life-time. Afterwards, decedent declined to continue this payment, and suit was brought in the circuit court of Alcorn county against him on his written obligation. This was in the name of Jane Hoskins, *alias* Jane Taylor. A. H. Taylor pleaded that it was procured from him under a threat that he would be prosecuted for living with her in open and notorious lewdness, and a suit for damages for breach of marriage contract. Taylor also pleaded payment, to which no replication was filed; but replication was filed to the first plea, denying the statements made in the plea. The transcript furnished is very imperfect, but from it it appears that the suit was brought 30th May, 1874. The obligation was dated 4th April, 1873. The cause was continued until the January term, 1876, and again to the February term, 1876. There appears in the transcript a contract of agreement, signed in the name of Jane Hoskins, transferring the written contract upon which the suit was brought to her attorneys, Curlee & Stanley and William F. Doud, to secure a fee of $1,000 to Curlee & Stanley, and $1,000 to said Doud. The transcript, without dates, shows a continuance by consent, and then a verdict for the defendant by a jury, and judgment against plaintiff and her security for the costs. This verdict and judgment does not state when rendered,

does not show that any judge presided, or on what issue the finding was had.

These are all the facts that need be stated on the question of the marriage of A. H. Taylor and Jane Hoskins, and on the legitimacy of the defendant, John W. Taylor, and from which I am satisfied that there was a rumor that there was an illicit intimacy between A. H. Taylor and Jane Hoskins, on account of which Jane Hoskins left Houston, and never afterwards returned to those with whom she had once had a fine social standing. This was natural. There is no direct proof that such unlawful connection existed between them, but it may be inferred from the circumstances, and if it did exist the presumption is that it continued until the parties took upon themselves a new relation; that is, the relation of husband and wife. This could have been done by marriage in good faith, had according to the statutes of the state, or under the rules of the common law; that is, by agreeing with each other to be husband and wife, and to live and cohabit together as such during their joint lives, this agreement being entered into in good faith. Such an agreement would have constituted a valid marriage, and especially so when followed by cohabitation as husband and wife; and relation might be inferred from the long cohabitation, and continued declarations that they were husband and wife, if nothing else appeared in the evidence. Not that the cohabitation creates the marriage, of itself, but it is evidence of the agreement between them that they did in good faith agree to become man and wife, and did evidence the agreement by the cohabitation as such. Taking it for granted that the relation which existed between these parties at Houston was an unlawful one, the question is, is there evidence that that relation was changed? Then, they did not represent themselves as husband and wife. Afterwards, they did so represent themselves, and were so considered and treated by those who knew them, and by his family and kindred. And, if there were no other evidence in the case, I am of opinion that the common-law marriage between these parties might be presumed; the presumption of law being that when a man and woman live together as husband and wife, and declare themselves to be such, they are lawfully married, and their children born while so living are legitimate children. But for this presumption, I could not establish the marriage of myself and wife, which took place nearly 57 years ago, as the records of the marriage are doubtless destroyed, and there is not a living soul who witnessed it; and the same may be said of thousands of others. If a common-law marriage between the parties did take place, then no declaration on their part could annul it.

The next question is, do the conduct and the declarations of the parties after Jane went to Europe rebut this presumptive evidence of a common-law marriage between the parties? It is insisted by complainants' counsel that the absence from A. H. Taylor for so long a time, of itself, rebuts this presumption. But it is not denied that A. H. Taylor furnished the money for her support during all this time, and of this there is proof. If it is unusual for a husband and wife to be sep-

arated so long, it certainly would be more unusual for a paramour to furnish the money to support his mistress for so long a separation. So that this fact is not sufficient to rebut the presumption of marriage; and this is especially so since it appears that he received her, and treated her, as his wife upon her return. But it is insisted that the son she brought with her was an illegitimate child, and that, if the parties were legitimately married, A. H. Taylor would not have received her, and represented her as his wife. But the age of the child when she returned, and the time of the absence, do not show that A. H. Taylor was not his father. There is more force in the conduct and declaration of the parties after the illicit intercourse commenced, and was known, between Jane, the reputed wife of the decedent, and R. T. Dunn. This illicit intercourse estranged the parties towards each other. After this, decedent did not like to admit that she was his lawful wife, and did not desire to be responsible for her debts, or anything else growing out of the marriage relation. He undoubtedly hated her, and desired to repudiate her, for this want of fidelity towards him, the first which the proof shows. Dunn had, by his arts as a seducer, won her affections; and in proportion as he had enamored her, and drawn all her affections from A. H. Taylor, in this proportion she hated him, and did not like to admit that she had broken her marriage vow. I do not believe there was a statutory marriage between the parties; and it is possible that they did not, when this changed relation between them occurred, believe that anything short of a statutory and formal marriage, solemnized by a minister or a civil officer, was a legal marriage, although a common-law marriage had existed between them; and hence they made the declaration that they had not been married.

But it is insisted on the part of complainants that the bringing of the suit in the name of Jane Hoskins, and the pleadings, verdict, and judgment in the circuit court of Alcorn county, are conclusive that these parties were never married. The bringing of the suit in the name of Jane Hoskins was the only way in which it could have been brought, and especially so under the changed relations which the parties had assumed towards each other; and while it is a circumstance to be considered, tending to show that a marriage had not taken place between the parties, the history of the lawsuit, as shown by the transcript, verdict, and judgment, falls far short of establishing that A. H. Taylor and Jane Hoskins were never married. Taking the whole proof together, if the case were on final hearing, on proof regularly taken, I would hesitate long in pronouncing that the proof as now presented, if regularly taken, establishes, or does not establish, a valid marriage between these parties; and this doubt is much greater when on *ex parte* affidavits mostly written by the parties or their counsel without cross-examination. But, as the defendant can suffer no great harm by holding for the present that complainants have established a *prima facie* right to the estate in litigation, and as a mistake against them might work an injury to complainants, I will, for the purpose of the motion, hold that they have a *prima facie* right to the property in litigation.

This brings us to the consideration of the validity of the deeds of conveyance exhibited with the answer of John W. Taylor. There is a good deal of doubt, under the proof, as to whether or not the deed of 1871 was ever delivered so as to vest the title in defendant. It is to my mind very clear that he did not intend that it should be known that such a deed had been made unless a controversy respecting a tax-title, and the plea of the statute of limitations, should arise; and I must hold it very doubtful as to the validity of the conveyance.

But the question as to the validity of the deed of 1889 is much more difficult, and the correct decision of it is of all importance in this case; for, if valid, the question of legitimacy, under the proof, becomes of little importance to either party, as it will dispose of all the valuable interest involved in this litigation. This deed is dated April 26, 1889, was written by the defendant, John W. Taylor, at the dictation of A. H. Taylor, and was on the same day taken by A. H. Taylor, the grantor, to the clerk of the chancery court of Alcorn county, and it was acknowledged by him before said clerk that he had signed and delivered on the day and year mentioned, as his official act and deed, and for the purposes therein mentioned. But it was not then filed for record. A. H. Taylor took the deed away with him. The clerk did not read the deed, and did not know its contents; nor was it known, so far as the proof shows, that such an instrument had been executed to any one save the grantor and the grantee until after the death of the grantor, when it was produced by the grantee, and placed on record. Very shortly after the death of A. H. Taylor the defendant stated to several persons that his father had made a deed conveying all his estate to him. The defendant, in his answer, which is responsive to the bill, states as follows:

"And for further discovery in this behalf, in response to said bill, respondent says he found, without the assistance of any other person, the conveyances referred to, of date April 26, 1889, in his iron safe, where he himself had previously placed the same, after he had written it at the request of said A. H. Taylor, deceased, and after its execution, acknowledgment, and delivery to him by said A. H. Taylor, deceased, for the purposes therein expressed, and that he came into possession of said instrument in no other way, and under no other circumstances."

This answer must be taken as true, unless rebutted and overcome by sufficient evidence; and, while the affidavit of the chancery court, stating that defendant made some inquiry of him, after the death of decedent, as to whether or not decedent had acknowledged a deed of conveyance before him, may raise some doubt on the subject, it is not sufficient, with the other facts stated in the affidavits, to overturn the answer in this particular. While it is true that this conveyance, so far as it purports to be a conveyance by the Tishomingo Savings Institution, states $9,000 as the consideration for the transfer, I am satisfied it was intended as a deed of gift. It is not shown that any money was paid, or intended to be paid, at a future time; and, as to that part of the conveyance purporting to convey the private estate of the grantor, it was evidently intended as a deed of gift. The rule of law is that deeds of gift

and settlement between the parties, and in no way affecting the rights of others, will be held as executed and delivered on less evidence than such conveyances for value, and which may affect the rights of creditors, and of others than the parties. So that I do not believe the objection to this deed, that it was never delivered, is maintained under the present proof.

It is insisted on the part of complainants that that portion of the conveyance which purports to be a conveyance by the Tishomingo Savings Institution of the assets of that institution is inoperative and void. This institution is a corporate body, an artificial person, entirely created by the act of the legislature and the action of the incorporators; and its powers can only be exercised by the board of trustees provided in the act of incorporation or charter. The stockholders or shareholders, if they have paid their capital stock, are not further liable for the debts or obligations of the corporation. The property and means of the corporation can alone be looked to, to meet the liabilities of the corporation. Hence the corporation cannot divest itself of its property and means only in the ordinary business for which it was created, for the payment of its liabilities, including dividends on its income, or, on final dissolution, to refund to the stockholders the capital stock paid in. In other words, it cannot commit suicide by making any other disposition of its means than is provided in its charter, which would be the result of holding this part of the conveyance valid. But, in addition to this, all other objections out of the way, the conveyance, to be valid, would have to have been made in pursuance to an order or resolution of the board of trustees, and under the corporate seal of the corporation. So that, without further comment, I must hold that this objection is well taken.

The next objection is that it does not purport to be the act and deed of A. H. Taylor as an individual, and does not purport to convey his individual property and estate, and is therefore inoperative and void as a conveyance thereof. At the conclusion of that portion of the conveyance purporting to be a conveyance by the corporation of its property and assets, the second clause is as follows:

"And further, I, A. H. Taylor, president of the Tishomingo Savings Institution, for the consideration of one dollar, do convey and transfer to J. W. Taylor all of my property and possessions whatever, both personal and real, consisting of all my right, title, interest, and stock in the Chattanooga Land, Coal, Iron, and Railway Company, and the Central Land Company of Chattanooga, Tennessee; the Sheffield Land, Iron, and Coal Company, Alabama; and the Tishomingo Savings Institution of Corinth, Mississippi; also, all my notes, mortgages, deeds of trust, and all my real estate, consisting of houses and lands situate and being in the states of Mississippi and New York. Witness my signature, as president of said Tishomingo Savings Institution, this 26th of April, 1889.             TISHOMINGO SAVINGS INSTITUTION.
                                    "A. H. TAYLOR, President."

It must be admitted that this is a most unusual document, which, perhaps, has no parallel. I am, however, satisfied that it was the purpose of the grantor to convey all the personal estate and property mentioned in the last paragraph of the instrument to the defendant, as well

as that mentioned in the first paragraph. I am further satisfied, from all the proof in the cause, that, while A. H. Taylor intended that all of said property and estate not disposed of, and vested in other property and means, remaining at his death, should by the operation of said conveyance pass to John W. Taylor, his son, the reason he did not place the deed on record was that he did not desire that it should be known until his death, or until he should desire to make it known, that he had divested himself of the title to the property and means described in this conveyance, fearing that such knowledge by the public would interfere with his business, and knowing that in the mean time the rights of creditors and all others, except himself and son, the grantee, could not be affected by the conveyance; and that the instrument was intended, as between the grantor and grantee, to convey the property described, and such as might be received in place of it, or its proceeds, to the defendant, and that the defendant should have complete control of it at the death of the grantor, or sooner if he desired; that in this particular it was intended, so far as it affected the rights of others, to be a substitute for a last will and testament.

If the cause were now on final hearing, under the same testimony, it would be a question of uncertainty as to how far it should be decided; and I will not now undertake to decide it the one way or the other. To decide it in favor of the complainants might do the defendant injustice; and, on the other hand, to decide it in favor of the defendant might do injustice to the complainants. And its decision now is not necessary to the disposition of the present motion. So the question is not now decided.

The remaining questions are shall a receiver be appointed; and what portion of the estate and property described in the bill shall be placed in his charge, if one shall be appointed? The question of the appointment of a receiver in any case is left to the sound discretion of the court, and such appointment is only made to preserve the property and assets for the benefit of all parties in interest. Sometimes it is necessary to collect the debts due; sometimes, to continue the business. This is especially so in railroad cases, manufacturing establishments, and other cases in which an immediate cessation of the business would work an injury, such as the completion and gathering of crops; and, in other cases, where real estate is to be leased out, rents collected, and taxes paid. The Tishomingo Savings Institution is not a party to this suit. Consequently the receiver, if one is appointed, will not be entitled to interfere with that corporation, its means, or its management. The other estate and assets described in the bill consist of town lots, lands, capital stock in the corporations mentioned, and debts due decedent's estate or the defendant, as the cause may be finally decided. It is necessary that the real estate be rented out, the rents and other debts collected, and the taxes paid; and it may become to the interests of all parties that portions of the real estate be sold, and that debts be compromised, also that the stocks, or some part of them, be sold, and other changes made, which cannot well be done, without sacrifice, only by the approv-

al of the court. For these reasons, more than any others, I am of opinion that it is best that a receiver be appointed to manage the estate and assets under the order of the court, which necessity exists regardless of the solvency of the defendant. But as the defendant is admitted to be competent to manage the estate, and as nothing is shown why he should not be appointed, a decree will be entered, appointing him as such receiver, upon his entering into bond, with two or more sureties, in the penal sum of $25,000, payable to the United States, for the use of whosoever may be entitled to the same, and conditioned for the faithful discharge of his duties as such receiver, as directed by the orders and decrees of the court. Said bond and sureties to be approved by a judge of the court, or, in the absence of a judge, by the clerk of the court.